**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| TRACY SPRADLIN, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:24-cv-1299 |
| v. | ) ) | |
| ELANCO ANIMAL HEALTH, INC., | ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) | |

**CLASS ACTION COMPLAINT**

Plaintiff Tracy Spradlin, individually and on behalf of all others similarly situated, respectfully offers the following for her complaint against Elanco Animal Health, Inc. Elanco has conspired to fix and stabilize the retail price of Imidacloprid topicals, created a monopoly in the relevant market, foreclosed generic Imidacloprid topicals from entering the market, and caused Plaintiff and consumers across the country to pay an inflated amount for Elanco's K9 Advantix II and Advantage II products.

Plaintiff seeks injunctive relief under federal antitrust law, damages under relevant state laws, the costs of this lawsuit, including reasonable attorneys' fees, and demand a trial by jury.

**NATURE OF THE ACTION**

1.      Elanco is the producer and manufacturer of squeeze-on, topical flea and tick prevention products that utilize Imidacloprid as the main active ingredient ("Imidacloprid topicals"). Elanco sells Imidacloprid topicals under the name brands of Advantage II and K9 Advantix II (the "Advantix Products").

2.      Elanco dominates the Imidacloprid topical market and controls nearly 100% of the market share.

3.     For example, in 2018 Elanco made 85% of the sales to retailers and distributors in the relevant market and received a patent license royalty for most of the other 15%.

4.     Elanco sells the Advantix Products to the largest pet-specialty retailers in America, and these retailers purchase the Advantix Products directly from Elanco.

5.     These retailers include PetSmart, LLC; Petco Animal Supplies Store, Inc.; Chewy, Inc.; PetMed Express, Inc.; and Petsense, LLC (the "Pet Specialty Retailers").

6.     This action arises from Elanco illegally fixing, stabilizing, and maintaining the retail prices of the Advantix Products. Elanco accomplished its scheme by pressuring Pet Specialty Retailers to agree to sell only the Advantix Products at the exclusion of generic brand Imidacloprid topicals in order to maintain a monopoly on the Imidacloprid topical market.

7.     Elanco and the Pet Specialty Retailers entered into verbal "no generics" deals where it offered to increase the retailer's profits if, and only if, the retailers refuse to carry generic Imidacloprid topicals.

8.     Thus, the Pet Specialty Retailers have banned generic Imidacloprid topicals from their shelves; retailers have even told Elanco's competitors that they have a "no generic" agreement with Elanco and that they specifically understand the agreement to bar any generics into the market.

9.     These agreements effectively foreclosed the market for Imidacloprid topicals from Elanco's competitors, allowed Elanco and the Pet Specialty Retailers to sell the Advantix Products at supra-competitive prices, and left consumers with substantially fewer options to learn about and purchase generic brand Imidacloprid topicals.

10.     Indeed, none of the Pet Specialty Retailers carry any other Imidacloprid topical other than those sold by Elanco.

11.     The FTC has found that companies like Elanco wield "substantial influence over distributors that can be used to restrict generic manufacturers' access to distributors," and as a result, the ability of "consumers to purchase generic animal drugs may be limited."[1]

12.     Indeed, "[i]f such agreements are in effect," they "impact generic manufacturers' ability to enter the animal drug industry."[2]  Because of that, "the absence of generic competition allows pioneer companies to continue to raise prices on and market drugs whose patents have expired . . . ."[3]

13.     For example, Tevra Brands, LLC competes with Elanco by producing a generic and more effective alternative to Elanco's Advantix Products. And Tevra offers its Imidacloprid topical products for sale at a much lower price than Elanco's Advantix Products.

14.     Currently, Tevra offers for sale its Activate II—the generic competitor to Elanco's K9-Advantix II. A four-month supply of Activate II sells for about $27 on Amazon, while a four-month supply of K9-Advantix II sells for about $54 on Chewy.com, and Advantage II for dogs sells for about $48.

15.     And for cats, Tevra also offers for sale Actispot II—the generic competitor to Elanco's Advantage II.[4] A six-month supply of Actispot II sells for about $30 on Amazon, while a six-month supply of Advantage II for cats sells for about $64 on PetSmart.com.

16.     Despite the significantly less expensive and more effective generic alternative that Tevra offers, none of the Pet Specialty Retailers carry Activate II or Actispot II due to Elanco's

---

[1]     *Competition in the Pet Medications Industry: Prescription Portability and Distribution Practices*, FTC Staff Report at 99 (May 2015).

[2]     *Id.* at 101.

[3]     *Id.* at 103.

[4]     Elanco also offers another imidacloprid topical under the name brand Advantage Multi.

unlawful anticompetitive conduct that has foreclosed Tevra and other generic Imidacloprid topical manufacturers from a substantial share of the relevant market.

17.     As a direct and proximate result of Elanco's unlawful market foreclosure, consumers paid higher prices for the Advantix Products than they would have absent Elanco's anticompetitive conduct.

## PARTIES

18.     Tracy Spradlin is a Kansas resident. She purchased K9 Advantix II (Large Dog) in-store at a PetSmart located in Missouri in the spring of 2021 and at a Petco located in Kansas in the spring of 2023.

19.     Elanco Animal Health, Inc., is an Indiana corporation with its headquarters in Indiana. Elanco is the manufacturer of the K-9 Advantix II and Advantage II products and the sole supplier of Imidacloprid topicals to the Pet Specialty Retailers. Elanco can be served at its registered agent, Corporation Service Company, 135 North Pennsylvania Street, Suite 1610, Indianapolis, Indiana 46204.

20.     In August 2020, Elanco acquired Bayer Healthcare LLC's animal health division, including the Advantix Products, for $7.6 billion. Elanco continues to illegally use the monopoly power first acquired by Bayer to dominate the Imidacloprid topical market and exclude generic Imidacloprid topicals from being sold at pet specialty stores.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this controversy under 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26 because it includes, in part, claims arising under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

22.     This Court also has subject matter jurisdiction over this controversy under 28 U.S.C. § 1332(d)(2) because this case alleges a class action claim in which the matter in

controversy exceeds $5,000,000, exclusive of interest and costs, and most of the class members are citizens of a state different from the citizenship of Elanco.

23.     This Court has supplemental jurisdiction over the state law claims herein pursuant to 28 U.S.C. § 1367.

24.     This Court has personal jurisdiction over Elanco because Elanco is headquartered in Greenfield, Indiana.

25.     Venue in this district is proper pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and Elanco is subject to personal jurisdiction in this District.

## GENERAL ALLEGATIONS

### I.      The Relevant Antitrust Market

26.     As explained in detail below, the relevant antitrust market for analyzing the illegal acts committed by Elanco is: topical flea and tick products for dogs and cats containing Imidacloprid sold by pet specialty stores in the U.S, including Elanco's Advantix Products and the equivalent generics of those products.

27.     The Pet Specialty Retailers hold themselves out as unique in the pet products industry: with experts available to help and higher level of customer service than traditional, "multi-outlet" (also called MULO or Food, Mass, Drug) retailers.

28.     Chewy states that "Real pet experts are here for you 24/7—we're just a call, chat, email, or social media message away."[5]

---

[5]     *About Us*, Chewy, https://www.chewy.com/app/content/about-us.

29.     Petco states that it is "an industry leading health and wellness company focused on improving the lives of pets, pet parents and our partners. Our highly trained professionals are focused on providing the best care for your pet . . . ."[6]

30.     The Pet Specialty Retailers emphasize their niche placement in the market, as PetMed Express offers "Pet Health Advice" where a consumer can "[s]earch through our endless list of education articles about pet health conditions, or write in to get free advice within 3 business days via email."[7]

31.     And yet another, PetSmart, tells consumers, "[a]s the leader in pet care, we make our decisions based on how we can bring pet parents closer to their pets . . . Our trusted and skilled associates share the same passion for pets as the pet parents we serve, helping pet parents choose from our offering of the largest variety of pet products and services in one convenient place – in your neighborhood or the palm of your hand."[8]

32.     And Petsense states that "[u]nlike other pet specialty retailers, we are able to provide a tailored experience for each customer and provide the top quality products they need at a price they love."[9]

33.     Consumers recognize this, and as a result "the pet specialty channel remains the top destination for pet product shopping by consumer usage, with nearly three-quarters of pet product shoppers (73 percent) having shopped in a pet specialty store in the past year."[10]

---

[6]     *About Petco*, Petco, https://corporate.petco.com/.

[7]     *Home Page*, PetMed, https://www.1800petmeds.com/.

[8]     *Home Page*, PetSmart, https://www.petsmartcorporate.com/.

[9]     *About Petsense*, Petsense, https://www.petsense.com/pages/about-us.

[10]    *Survey Reveals Why Pet Owners Do—Or Don't—Shop at Local Pet Specialty Stores*, Pet Product News (Oct. 4, 2022) https://www.petproductnews.com/blog/survey-reveals-why-pet-

34. Defendant knows that consumers learn about products through Pet Specialty Retailers and, therefore, if Defendant can keep new products out of Pet Specialty, stores then consumers won't learn about products that are competitive.

35. The geographic market for analyzing the antitrust violations committed by Elanco is the United States. Manufacturers of Imidacloprid topicals sell those products to retailers with locations throughout the United States, to distributors throughout the United States who sell the products to retailers, and those retailers subsequently sell the products to consumers in all fifty states. Because these products are based on pesticides regulated by the U.S. Environmental Protection Agency, they can only be imported or sold by companies that register them for particular uses. This regulatory constraint defines the limited geographic market as the United States.

## II. Elanco substantially foreclosed Imidacloprid topical generics from the relevant market through its exclusive agreements and no generics scheme.

36. As set forth below, Elanco illegally fixed and stabilized the retail prices of the Advantix Products and prevented the entry of true generic Imidacloprid topicals into the relevant market.

37. The results of Elanco's illegal, anticompetitive, and exclusionary actions have been less competition, higher prices, and fewer choices for consumers.

### A. Elanco's—then Bayer's—acquisition of monopoly power in the relevant market

38. Bayer initially acquired its monopoly when it sought and obtained a 10-year period of "exclusivity" by registering its Imidacloprid formulation with the U.S. Environmental

---

owners-do-or-don-t-shop-at-local-pet-specialty-stores/article_4a1523d0-43f2-11ed-8c2f-83962a0ec395.html

Protection Agency. Bayer also sought and obtained legal protection for its monopoly by obtaining U.S. patents on its invention.

> **i.    Bayer's patents in the relevant market**

39.    In 2002, Bayer introduced its Advantage line of Imidacloprid topicals, which now includes Advantage II and K9 Advantix-II. Bayer protected its inventions by obtaining several U.S. patents, one of which expired in 2015.

40.    In 2016, the generic manufacturer CAP IM Supply, Inc. was granted conditional registration by EPA for its generic Imidacloprid topical and became the first manufacturer of generic Imidacloprid topicals to attempt to enter the market for Imidacloprid topicals.

41.    On May 22, 2017, three Bayer entities filed a patent infringement lawsuit against CAP IM Supply, Inc. in U.S. District Court for the District of Delaware. This lawsuit was shortly settled and CAP IM began paying Bayer royalties for the use of its patented formula. Imidacloprid topicals produced by CAP IM have been sold in the U.S. by several companies including TruRx and PetIQ, under various brand names including Advecta, PetLock and ParaDefense. These sales do not represent unrestrained generic competition against Bayer, but rather are licensed products, also known as "authorized generics," from which Bayer profits through its receipt of royalties.

42.    Bayer successfully had CAP-IM's product "PetLock" removed from store shelves at Petco and appears to have relegated CAP-IM products to the less-lucrative "Food, Mass, and Drug" channel of grocery stores, discount stores, and drug stores.

> **ii.    Registration of insecticides with EPA and "exclusive use"**

43.    The insecticides used as active ingredients in flea and tick treatments are regulated by the U.S. Environmental Protection Agency, under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. § 136a, et seq. This statute requires that manufacturers of insecticides register each formulation before offering it for sale in the U.S.

44.     To obtain EPA registration under FIFRA for the use of an insecticide for a particular purpose, a company must submit detailed scientific data demonstrating the safety and effectiveness of that use of the insecticide formulation.

45.     If the EPA agrees to register the use of an insecticide for a particular purpose, the registering company has "exclusive use" of the data used to register that insecticide for that purpose, for a period of 10 years after registration, pursuant to FIFRA, 7 U.S.C. § 136a, et seq.

46.     The 10-year "exclusive use" period created by FIFRA registration effectively gives the registering company a monopoly over the use of the insecticide for the particular purpose.

47.     The 10-year exclusive use period under FIFRA has expired for both Fipronil and Imidacloprid topicals, allowing generic manufacturers such as Tevra to attempt to enter the market.

**B. Tevra's attempts to enter the market for Imidacloprid topicals**

48.     In 2016, Tevra created detailed sales forecasts for both its generic Fipronil topicals and its generic Imidacloprid topicals.

49.     Tevra's Imidacloprid topicals are more effective than the Advantix Products. Both topicals contain the same active ingredient, but Tevra's method of delivering that active ingredient to the skin of the pet is superior to the Advantix Products.

50.     Controlled experiments have demonstrated that Tevra's Imidacloprid topicals kill over 99% of fleas, just as the Advantix Products do, but Tevra's Imidacloprid topicals also kill ticks more effectively than the Advantix Products. In addition, Tevra's Imidacloprid topicals are less toxic than those produced by Elanco, due to their superior delivery method.

51.     Even before EPA registration was complete, Tevra hired a sales team of professionals with experience in the industry, and aggressively pursued sales to retailers. Beginning in 2016, Tevra's salespersons met with representatives of numerous retailers, including those identified below.

### i.    Tevra's successful entry into the separate Fipronil topical market

52.    In 2017, Tevra made its first sales of its generic Fipronil topical. Because Tevra's product was a less expensive, equally effective alternative to Frontline, Tevra was able to demonstrate to retailers that carrying Tevra's generic Fipronil topical would increase sales and profits for the retailers.

53.    Attracted by the price and profitability advantages of Tevra's generic Fipronil topical, retailers began buying it in large quantities. Tevra made a profit of over $2.4 Million from online and pet specialty sales of its generic Fipronil topical in 2018.

### ii.    Generic Manufacturers of Imidacloprid topicals have been foreclosed from entering the Imidacloprid topical market.

54.    Tevra's attempts to sell its less expensive, more effective, generic Imidacloprid topical, however, have been substantially foreclosed by Elanco's scheme.

55.    Tevra attempted to sell its generic Imidacloprid topical to each of the Pet Specialty Retailers, several of which were already carrying Tevra's generic Fipronil topical. However, the Pet Specialty Retailers refused to carry Tevra's generic Imidacloprid topical.

56.    Until the time of this filing, the Pet Specialty Retailers have refused to carry generic Imidacloprid topicals from Tevra—or any other generic Imidacloprid supplier—even though they all sell generic Fipronil topicals.

57.    In a competitive market, generic Imidacloprid suppliers would be able to sell their products to the largest Pet Specialty Retailers. No pro-competitive reason exists for the absence of any sale of a generic imidacloprid topical by the Pet Specialty Retailers except for Elanco's scheme to conspire to fix the prices of the Advantix Products to increase Elanco's profits.

58.    For example, Tevra's generic Imidacloprid topicals are significantly less expensive than the Advantix Products. Indeed, Tevra has offered to sell Pet Specialty Retailers generic

Imidacloprid topicals for approximately 50% or less of the Advantix Products' discounted wholesale price for K9 Advantix II Imidacloprid topicals.

59.     Despite the lower prices of Tevra's Imidacloprid topicals and more effective application than the Advantix Products, the Pet Specialty Retailers have refused to carry anything but the Advantix Products in the relevant market.

60.     If a retailer purchased generic Imidacloprid topicals, the retailer could charge consumers prices that are significantly lower than the retail prices of the Advantix Products.

### C. The "No Generics" Agreement: Elanco and the Pet Specialty Retailers exclusive dealings foreclosed entry into the relevant market for other Imidacloprid topicals.

61.     In order to reap additional profits, Elanco and the Pet Specialty Retailers agreed to exclude generic Imidacloprid topicals. To do this, Elanco entered into verbal "no generics" deals with each Pet Specialty Retailer. In exchange for those deals, Elanco shares some of its illegal profits in exchange for the Pet Specialty Retailer's agreement not to offer generic Imidacloprid topicals.

62.     Elanco deals directly with each Pet Specialty Retailer, offering to increase the retailer's profits if, and only if, the retailers refuse to carry generic Imidacloprid topicals. Elanco is able to do this because it had been charging supra competitive prices and making supra competitive profits from the sale of its Imidacloprid topicals after years of substantial price increases since at least 2011.

63.     To perpetuate this monopolistic price fixing scheme, Elanco requires the Pet Specialty Retailers to ban generic Imidacloprid from its shelves and shares the profits of the unlawful conduct in exchange for their compliance in maintaining the supra competitive prices of the Advantix Products.

64.     The deal is profitable for both Elanco and the Pet Specialty Retailers and detrimental to consumers.

65.     Elanco—then Bayer—made written presentations to both Petco and PetSmart in 2016 and was explicit about the increased profits both Bayer and the retailers could make by keeping generic Imidacloprid topicals off the store shelves.

66.     When Bayer made its presentation to Petco in August 2016, Petco was carrying a generic Imidacloprid topical called "PetLock." Even though Bayer was collecting royalties on every unit of PetLock sold (as a result of its settlement agreement with CAP-IM, the maker of PetLock), Bayer still wanted to force Petco to remove PetLock from its shelves, so that Bayer could make even more money.

67.     Bayer's requirement that Petco and PetSmart play ball was a success. Petco and PetSmart removed generic competition and offered their customers only the higher-priced Bayer name brands.

68.     The explicit deal Elanco agreed to with Petco and PetSmart is price-fixing: an exclusion of competitors to keep retail prices artificially high and divide the ill-gotten profits.

69.     The losers in the deal were consumers who were forced to pay higher prices.

> i.    **Pet Specialty Retailers all refuse to purchase the generic Imidacloprid topicals from manufacturer Tevra.**

70.     Retailers Chewy, Petco, PetSmart and PetMed are internet pet specialty retailers. In addition, Petco and PetSmart are also "brick and mortar" pet specialty retailers, along with PetSense. Each of the Pet Specialty Retailers are pet specialty stores and carry products only related to the care of pets.

71.     Tevra offered each of the Pet Specialty Retailers generic Imidacloprid topicals at prices that are about 50% lower than the discounted prices of the Advantix Products offered by

Elanco under its Purchase Agreements, but each retailer refused to carry Tevra's product, despite Tevra's generic Imidacloprid topicals being more effective.

72.     More than one retailer has explicitly told Tevra that it believes it has a "no generics" agreement with Elanco, even though the written contracts do not expressly include the verbatim phrase "no generics."

**Chewy**

73.     For example, Chewy told Tevra that "they had an agreement with Bayer that prevented them from offering a generic to Bayer's K9 Advantix," or words to that effect. Drs. Foster & Smith (later Petco) also told Tevra about "the Bayer 'no generic'" requirement.

74.     Tevra began discussions to sell generic Imidacloprid topicals to Chewy in the fall of 2016. In 2017, a representative of Chewy told a Tevra salesperson that Chewy "had a contract with Bayer and could not offer a generic to K9 Advantix II," or words to that effect. Chewy also told another Tevra salesperson "that they had an agreement with Bayer that prevented them from offering a generic to Bayer's K9 Advantix," or words to that effect.

75.     In July 2018, Tevra salespersons again met with representatives from Chewy and discussed the possibility of Chewy carrying Tevra's generic Imidacloprid topical in competition with Bayer's K9 Advantix II. A representative of Chewy told a Tevra salesperson that they could not sell both Bayer and Tevra Imidacloprid products.

76.     In October 2018, a Tevra salesperson spoke with a representative of Chewy, who told the Tevra salesperson that Chewy "is trying to work with Bayer on the contract. There was some old language in the old agreement that either prevented [Chewy] from offering a generic or featuring 'Compares to' or contains the same active ingredient," or words to that effect.

77.     In 2019, Chewy told a representative from Tevra that if Chewy purchased Tevra's product, "they would lose $3 million dollars in net margin taking into account the reduced Bayer rebate vs. what they thought they would make in margin selling [Tevra's] product," or words to that effect.

78.     Chewy ultimately refused to purchase Tevra's generic Imidacloprid topical.


**Petco**

79.     In 2018, Tevra salespersons were attempting to convince Drs. Foster & Smith (later Petco) to carry Tevra's generic Imidacloprid topical. A representative of Drs. Foster & Smith told one of Tevra's salespersons that Drs. Foster & Smith would not carry Tevra's generic Imidacloprid topical because "it was a conflict of interest given the recent Bayer 'no generic' as to pulling advertising funding and lucrative rebates," or words to that effect.

80.     In the summer of 2018, Tevra salespersons made presentations to Petco showing the sales and profitability advantage of Tevra's generic Imidacloprid topical. A representative of Petco later told a Tevra salesperson that Petco had "no interest in Own Brands or generic compromise as the Bayer rebates are HUGE," or words to that effect.

81.     Elanco also offered direct payments to PetCo in exchange for removing generic Imidacloprid products, including the PetLock generic, from its shelves.

**PetMed Express**

82.     In 2018, salespersons for Tevra made a presentation to PetMed. During that presentation, a representative of PetMed Express stated that "they had an agreement with Bayer." PetMed.

83.     PetMed told Tevra about its "program with Bayer and not allowing any generic equivalence," or words to that effect.

84.     In 2019, a sales person for Tevra had a discussion with a representative of PetMed in which the representative described PetMed's "program with Bayer and not allowing any generic equivalents," or words to that effect.

85.     PetMed Express ultimately refused to purchase and stock Tevra's generic Imidacloprid topical.


**Petsense**

86.     In February 2017, a salesperson for Tevra informed Petsense that Tevra had just received EPA registration for its generic Imidacloprid topical. In March 2017, Tevra made an offer to Petsense with significant incentives to encourage Petsense to carry Tevra's generic Imidacloprid topical. Petsense directed Tevra to discuss the sale of Tevra's product through the distributor to Petsense.

87.     In discussions with the distributor, Tevra salespersons were told of the existence of a "Bayer agreement," and were told that "they were going to let us know if the agreement prohibits them from adding another Imidacloprid product."

88.     Petsense ultimately refused to purchase and stock Tevra's generic Imidacloprid topical.

**PetSmart**

89.     An affiliate of PetSmart told Tevra that Bayer was trying to "bundle" its rebate program for both PetSmart and the affiliate. The affiliate then stopped negotiating with Tevra,

because of the Bayer rebate program. PetSmart and its affiliate ultimately refused to purchase and stock Tevra's generic Imidacloprid topical.

90.     After Tevra sued Bayer, Tevra offered its generic Imidacloprid topical product to online and pet specialty retailers at prices significantly lower than those offered by Bayer. Online and pet specialty retailers continued to refuse to purchase Tevra's generic Imidacloprid topicals.

> **ii.     Elanco's Purchase Agreements block generic entry into the relevant market.**

91.     Elanco also blocked generic competition by revising its Purchase Agreement with Pet Specialty Retailers to cut the price of a large bundle of Elanco products, including its "blockbuster" Seresto Flea Collar, on the explicit condition that the retailers refuse to carry generic Imidacloprid topicals that competed with Elanco's higher-priced Advantix Products.

92.     Elanco also "rewarded" retailers that consented to the scheme with higher discounts if those retailers refused any "compare to" placement of competing generics.

93.     The Purchase Agreements also include a series of discounts that are aimed at preventing generic competitors from entering the market. Elanco includes multiple "loyalty" discount provisions in contracts with the Pet Specialty Retailers, some of which require exclusivity, exclusive advertising, and carrying the Advantix Products. Other discounts prohibit "compare to" advertising, and making offers "triggering a switch from [Elanco's] brands."

94.     The Purchase Agreements are not easily terminable by retailers or distributors. Elanco controls at least 85% of sales in the relevant market—and effectively 100%—since Elanco receives royalties for most of the remaining 15% of sales. A retailer who terminates or violates its Purchase Agreement with Elanco risks losing the right to buy products that any pet specialty retailer must have to compete. That the Purchase Agreements are not easily terminable is further evident from the fact that neither Chewy, Petco, or PetMed—who represent over 75% of internet

sales—nor Petco, PetSense or PetSmart—who represent over 70% of pet specialty in store sales—ever terminated their Elanco contracts or withdrew from the Elanco's anti-competitive scheme to substantially foreclose generic Imidacloprid topicals and fix the retail prices of the Advantix Products.

95.     The Purchase Agreements are also not easily terminable in part because the Pet Specialty Retailers refuse to terminate those agreements in fear that they would lose the anticompetitive bundle pricing and rebates on Bayer's products.

96.     If a Pet Specialty Retailer did not participate in Elanco's loyalty discount program, it could not compete with another retailer who did participate in the discount program. This is the case in part because nearly every Purchase Agreement provided by Elanco makes clear that Elanco's customers understand that every other retailer and distributor gets the same base price on Elanco's products, and that discounts will be offered on an "equivalent basis . . . . [T]he list pricing offered hereunder shall be [Elanco's] standard list pricing for all channels of trade. Opportunities for Purchaser to qualify for Discounts and Rebates shall be offered on an equivalent basis." These provisions are a written assurance given to the Pet Specialty Retailers that they will be getting the same base pricing on Elanco's products, and that discounts will be offered on an "equivalent basis" as their competitors.

97.     This also assures that each Pet Specialty Retailer knows and is assured that the other Pet Specialty Retailers will be entering into the same illegal no-generics agreement with Elanco.

98.     Additionally, the clause in the Elanco written agreements that informs retailers and distributors that their competitors will get the same base pricing is a warning to each Pet Specialty Retailer that they will be at a severe cost disadvantage if they do not participate in the "no generics"

17

agreement because each Pet Specialty Retailer can see that its competitors will be getting a very substantial discount that it will not receive.

99.     The discounts individually and collectively allow the Pet Specialty Retailers and Elanco to engage in exclusive dealing by substantially foreclosing manufacturers of generic Imidacloprid topicals.

100.     Regardless of the stated length of the Purchase Agreements or their termination clauses, the Purchase Agreements and the verbal no-generics agreements are not easily terminable and effectively operate as de facto long-term exclusive dealing agreements with the intent and effect to substantially foreclose generic manufacturers of Imidacloprid topicals from the relevant market.

101.     The Pet Specialty Retailers cannot afford to cancel the Purchase Agreements or violate the no-generics agreements in part because Elanco has market power in the relevant market, and, if Pet Specialty Retailers were to terminate the Purchase Agreements, they would lose millions of dollars in discounts on Seresto and other products.

102.     Further, and as mentioned above, Elanco can enforce the "no generics" agreements through the terms of the Purchase Agreements, including but not limited to terms stating to Elanco's customers that they and their competitors receive the same base pricing and that discounts will be offered on "an equivalent basis."

103.     In addition, significant barriers to entry into the Imidacloprid topical market exist. These barriers to entry include the Elanco's anti-competitive conduct itself, which substantially forecloses generics from the market. These and other barriers to entry substantially foreclose generics from the relevant market. Thus, the Purchase Agreements are effectively sufficiently long term to foreclose competition and are not easily terminable.

104.    Thus, the Purchase Agreements, the no-generics agreements, and related understandings amount to long-term exclusive dealing agreements between Elanco and the Pet Specialty Retailers.

> ### iii.    Elanco has succeeded in maintaining its price-fixing scheme and foreclosing competition through exclusive dealing.

105.    Elanco's price-fixing scheme has been remarkably successful. None of the Pet Specialty Retailers have ever agreed to purchase Tevra's product.

106.    And as of the date of this filing, none of the Pet Specialty Retailers carry any competing generic Imidacloprid to Elanco's Advantix Products, but they each carry a long list of Fipronil generic topicals.

107.    For example, Chewy carries the named brand Frontline Plus, but also carries the following generic fipronil topicals:

- Petarmor Plus;

- NextStar;

- First Act;

- Onguard Plus;

- PetPrevea Plus;

- Catego;

- and Sentry Fiproguard.

108.    Elanco has been able to maintain its monopoly and increase its prices and increase its profitability, despite the expiration of one of its patents and the loss of "exclusive use" of its EPA registration data. The Pet Specialty Retailers all charge supracompetitive prices for the Advantix Products while foreclosing generic Imidacloprid topicals from their shelves.

109.    Elanco's foreclosure of the market has been substantial, both in the share of the relevant market that has been foreclosed and in the length of time it has been foreclosed. The Purchase Agreements have continued to be renewed by the Pet Specialty Retailers who all continue doing business today.

110.    Additionally, Chewy, Petco, and PetMed represent over 75% of Imidacloprid topical sales by internet retailers—regardless of whether the supplier is a pet specialty retailer or not. And Petco, PetSense, and PetSmart represent over 70% of Imidacloprid topical sales by in store pet specialty retailers.

111.    In short, Elanco dominates the Imidacloprid topical market and effectively controls nearly 100% of the market. It is responsible for 85% of all imidacloprid topicals sold in the United States. And because of its licensing agreements, it effectively controls a substantial portion of the remaining 15%.

**III.    Imidacloprid Topicals is a properly defined antitrust market.**

112.    The U.S. antitrust enforcement authorities, the Department of Justice and the Federal Trade Commission, routinely use the term "relevant antitrust market" to describe the market for a product and its economic substitutes, for the purpose of antitrust analysis. This Complaint will use the DOJ/FTC terminology, which is also widely used in the legal and economic literature on antitrust subjects.

113.    For the reasons explained below, the relevant product market does not include topical products containing other active ingredients such as Fipronil (for example, Frontline and its generic equivalents), or non-topical products like flea collars, oral medications, or shampoos.

114.    The limits of the relevant product market are described below in terms of cross-elasticity of demand (§ III.A), the Hypothetical Monopolist Test (§ III.B), and interchangeability (§ III.C).

## A. Economic Substitutes and Cross-elasticity of Demand

115.    Different products may be said to "compete" in the general sense (because they have the same intended purpose), but the colloquial use of the term "compete" does not mean that they are in the same relevant antitrust market and does not preclude the possibility that one of the "competing" products has been monopolized. It is common for pharmaceuticals and chemicals to be monopolized (often legally by patent protection), even though there are other products that have a similar intended purpose.

116.    All products have a chain of substitutes, but not every product has "economic substitutes" that are relevant for antitrust analysis. At one end of the chain of substitutes for a particular product are "strong" substitutes. One example is the substitution of beet sugar for cane sugar. In their processed form, they are nearly identical, and buyers treat them as interchangeable. Further down the chain are "weaker" substitutes, such as honey for cane sugar. They are similar, but not identical, in characteristics, and fewer buyers treat them as interchangeable. Ultimately, there may be very weak substitutes for a particular product, such as saccharin for cane sugar, with significantly different characteristics and little or no interchangeability in the eyes of buyers.

117.    As a matter of economic theory, at competitive prices, buyers will only consider "strong" substitutes for a product they wish to purchase. At competitive prices, buyers would have no reason to consider "weak" substitutes for the product they desire and would not accept the inferior characteristics of those weak substitutes. For example, buyers have no reason to consider medicines with less-desirable active ingredients if the generic equivalent of their favored medicine (with the same active ingredient) is readily available at a competitive price.

118.    The economic concept of price elasticity provides a method of separating strong substitutes from weak substitutes for a given product. Price elasticity measures the number of buyers that would switch from Product A to Product B, in response to a change in the price of

Product A. Strong substitutes for a given product have a "high elasticity of demand" with respect to that product. Even a small price increase in Product A would cause buyers to switch to the strong substitute Product B. Conversely, weak substitutes for a given product exhibit a "low elasticity of demand" with respect to that product. A small increase in the price of Product A would not result in switching to the weak substitute, Product B, since buyers would want to avoid the inferior characteristics of that substitute.

119.    Unrestrained competition by strong substitutes keeps prices at a competitive level. That is, if Product A and Product B are strong substitutes, competition from Product A helps maintain competitive prices for Product B, and vice versa. If strong substitutes are unrestrained and competitively available, no opportunity to monopolize the market will arise.

120.    If strong substitutes are not available (or otherwise constrained), monopolists are able to increase prices above competitive levels, as buyers are forced into two inferior choices: (1) consider weaker and weaker substitutes; or (2) pay inflated prices. For example, if the manufacture of ibuprofen was monopolized and the average price rose from $5 per bottle to $20 per bottle, buyers would be faced with the inferior choice of: (1) switch to aspirin, or (2) pay inflated prices. If monopolists controlling the manufacturing of cars raised the average price of a car to $75,000, buyers would be faced with the inferior choice of: (1) learn to ride motorcycles; or (2) pay inflated prices.

### B. Defining Relevant Antitrust Markets Using the Hypothetical Monopolist Test

121.    One widely-recognized economic tool for determining the limits of a relevant antitrust market (and identifying the products in that market) is the Hypothetical Monopolist Test ("HMT"). This test is commonly used by DOJ and FTC to determine whether certain products are, or are not, included in a relevant antitrust market.

122.    As set forth below, a straightforward application of the HMT, shows that Fipronil topicals  (including Frontline and its generics) and non-topical flea and tick treatments are *not* in the same relevant antitrust market as Imidacloprid topicals (including Advantage, Advantix and their generics).

123.    The HMT is used to determine whether a particular product is part of a relevant antitrust market by considering that product as a possible substitute and answering the following question: Could a hypothetical monopolist raise the price of Product A by a small, but significant non-transitory increase in price ("SSNIP"), without decreasing its profits because of price-induced switching to Product B?

124.    If a SSNIP in Product A would be profitable to a hypothetical monopolist, then the possible substitute of Product B is a weak substitute that should be excluded from the relevant antitrust market. Conversely, if enough consumers switch to Product B that it renders the SSNIP in product A unprofitable, then Product B is a strong substitute and should be included in the relevant antitrust market with Product A.

125.    The HMT is an iterative process that tests the cross-elasticity (substitutability) of one product after another and continues until the outer limits of the relevant antitrust market have been defined. If Product B is determined to be in the same relevant antitrust market as Product A (because it renders a SSNIP in Product A unprofitable for the hypothetical monopolist) then the next iteration of the HMT tests the next strongest substitute – Product C. If switching to Product C renders a SSNIP in Product A unprofitable, then Product C is also a strong substitute and should be included in the relevant antitrust market with Products A and B. The process continues until a weak substitute if found that does not render a SSNIP of product A unprofitable for the hypothetical monopolist. At that point, the weak substitute, and all other weaker substitutes, are

excluded from the relevant antitrust market. Below is a graphic representation of the Hypothetical Monopolist Test and possible substitutes:



126.     To apply the HMT to decide which products are in the same relevant antitrust product market as Elanco's brand-name Imidacloprid topicals, economists and antitrust enforcement agencies begin by identifying the product that is the closest substitute for Elanco's brand-name Imidacloprid topicals. The Horizontal Merger Guidelines (§ 4.1.3) state that this product should be identified based on evidence of "how customers have shifted purchases in the past in response to relative changes in price or other terms and conditions." Elanco has identified that product: it is generic Imidacloprid topicals. Elanco knows this because when brand-name and generic Imidacloprid topicals are sold in the same store, more customers switch from Elanco's brand-name Imidacloprid topicals, the Advantix Products, to generic Imidacloprid topicals than to any other product.

127.    The agencies would then apply the HMT to a candidate market that includes only branded and generic Imidacloprid topicals. In that market, a hypothetical monopolist who controlled both the branded and generic products could profitably raise price by a SSNIP. Elanco knows this because it did profitably increase price when it controlled both the branded and the authorized generic Imidacloprid topicals. That price increase was not rendered unprofitable by customers switching to any other product. Therefore, the HMT and the real-world data support the conclusion that no other product is in the antitrust relevant product market.

128.    The Merger Guidelines (§ 4.4.1) state that the agencies will choose "the smallest relevant market satisfying the hypothetical monopolist test." Therefore, a market that satisfies the HMT is an antitrust relevant product market even if some weaker substitutes exist outside the market. As the Merger Guidelines (§ 4.4.1) explain:

> Groups of products may satisfy the hypothetical monopolist test without including the full range of substitutes from which customers choose. The hypothetical monopolist test may identify a group of products as a relevant market even if customers would substitute significantly to products outside that group in response to a price increase.

> Example 5: Products A and B are being tested as a candidate market. Each sells for $100, has an incremental cost of $60, and sells 1200 units. For every dollar increase in the price of Product A, for any given price of Product B, Product A loses twenty units of sales to products outside the candidate market and ten units of sales to Product B, and likewise for Product B. Under these conditions, economic analysis shows that a hypothetical profit maximizing monopolist controlling Products A and B would raise both of their prices by ten percent, to $110. Therefore, Products A and B satisfy the hypothetical monopolist test using a five percent SSNIP, and indeed for any SSNIP size up to ten percent. This is true even though two-thirds of the sales lost by one product when it raises its price are diverted to products outside the relevant market.

129.    Elanco has identified other, weaker substitutes for its Imidacloprid topicals, and monitors the extent to which consumers switch from Imidacloprid topicals to those other products in response to changes in price. The products that Elanco tracks most closely are Fipronil topicals

such as Frontline, and non-topical Imidacloprid products such as Seresto flea collars and Advantus soft chews. Elanco's own studies show that these weaker substitutes do not constrain Bayer's ability to raise the price of its Imidacloprid topicals above the competitive level. This confirms that these products are not in the antitrust relevant product market under the HMT.

130.    Other flea and tick medications exist, such as sprays, shampoos, and drugs available only by prescription. All of those products are weaker substitutes than any of the products discussed above and are also excluded from the market by the HMT. Below is a graphic representation of the relevant antitrust market for Imidacloprid topicals. Because the closest substitute, Fipronil topicals, did not constrain Elanco's repeated and significant price increases, and they are not included in the relevant antitrust market and neither are more distant substitutes such as oral, collars and shampoos:



131.    Thus, to apply the HMT in the present case, one should begin with Elanco's Imidacloprid topicals, the Advantix Products, as Product A, and test whether Product B – Fipronil

topicals, renders a SSNIP unprofitable for Elanco. If a SSNIP is profitable for Elanco, then the limits of the relevant antitrust market have been found and Fipronil topicals should be excluded from the market definition.

132.    Upon information and belief, application of the HMT illustrates Elanco consistently applied SSNIPs to its Imidacloprid topicals from 2011 through the present without weaker substitutes rendering the SSNIP unprofitable for Elanco.[11]

133.    Bayer's price increases were unrestrained by the presence of Fipronil products; they were also profitable and did not induce consumers to switch to Frontline or other fipronil topicals, generic or otherwise.

134.    Elanco's own document featured at a leadership conference in 2017 contained its own analysis demonstrating that there was no significant switch to Frontline in response to Elanco's price increases.

135.    Elanco's consistent price increases demonstrate Fipronil topicals are not strong substitutes for its Advantix products; between 2011 and 2016 three new Fipronil topicals entered the market, but none of them forced Elanco (then Bayer) to cut or stabilize its prices of the Advantix Products, and none of those products are sold at the Pet Specialty Retailers.

136.    That Imidacloprid topicals are within their own market is also demonstrated by the difference in price between Imidacloprid and Fipronil topicals sold by Pet Specialty Retailers. The Advantix Products are more expensive than Frontline—the name brand Fipronil product. For

---

[11]    *See* Second Amended Complaint for Antitrust Violations of the Sherman Act § 2 (Maintenance of a Monopoly), the Sherman Act § 1 (Exclusive Dealing) and the Clayton Act § 3 (Exclusive Dealing), *Tevra Brands, LLC v. Bayer Healthcare, LLC et al.*, No. 19-CV-4312 (Apr. 29, 2021), ECF No. 196, at ¶¶ 39–54.

example, a twelve-month supply of K9 Advantix II sells for $151.96, whereas a twelve-month supply of Frontline Plus for Dogs sells for $142.16.[12]

137.    This price differential demonstrates that generic Fipronil topicals are not price constraints on the Advantix Products and Elanco is acting as a monopolist by charging monopoly prices.

> **C.    Imidacloprid topicals are distinct from and non-interchangeable with Fipronil topicals and other flea and tick medication.**

138.    Different products may have similar intended purposes, but whether they are in the same or different relevant antitrust markets depends on: (a) their similarity of characteristics and (b) whether, as an economic matter, buyers actually switch between them based on price. Aspirin and ibuprofen both relieve pain but they are not in the same relevant antitrust market, because buyers do not switch between them based on price. Aspirin is much cheaper than ibuprofen, but many buyers nonetheless purchase ibuprofen (they do not substitute due to price), because ibuprofen is a different product with different characteristics. In fact, many buyers would likely reject aspirin even if the price of aspirin declined or the price of ibuprofen increased, because they want the more desirable characteristics of ibuprofen and do not view aspirin as interchangeable.

139.    Much in the same way that ibuprofen and Aspirin both relieve pain but are not in the same relevant market, Imidacloprid and Fipronil both treat flea and ticks but are also not in the same relevant market.

---

[12]    *Compare* Frontline Plus Fela & Tick Spot Treatment for Medium Dogs, 23–44 lbs, Chewy, available at https://www.chewy.com/frontline-plus-flea-tick-spot/dp/360502 (accessed July 11, 2024), *with* K9 Advantix II Flea & Tick Spot Treatment for Dogs, 21–55 lbs, Chewy, available at https://www.chewy.com/k9-advantix-ii-flea-tick-spot/dp/360511 (accessed July 11, 2024).

140.     Many pharmaceuticals and chemicals are sold in single product markets because the price of those products is not constrained by other pharmaceuticals and chemicals that can be used for the same purpose but are weak substitutes. This is not surprising, since new chemicals and pharmaceuticals are typically invented, patented, and sold as improvements over the existing pharmaceuticals and chemicals already available to buyers.

141.     Branded products and their generics typically have high cross elasticity of demand with one another, so markets with generics typically include the original branded product and its generic equivalents. However, absent evidence of high cross-elasticity of demand with other products, the branded product and its generic equivalents are part of a single-product market that does not include other products. Single product markets for chemicals and pharmaceuticals are common and have often been recognized by courts.

### i.     The FTC examines Elanco's acquisition of Bayer's animal health division.

142.     In 2020, Elanco acquired the Advantix Products line and brand when it purchased Bayer Healthcare LLC's animal health division for $7.6 billion. The acquisition of the Advantix Products line was a key component of the acquisition for Elanco.[13]

143.     Out of the acquisition, antitrust questions arose because Bayer and Elanco product lines overlapped, specifically because "several of Bayer's and Elanco's products have some of the same active ingredients."[14]

---

[13]     *See* Mushir Shaikh, *Elanco rattles investors with $7.6B buy of Bayer's animal health unit*, S&P Global (Aug. 20, 2019), https://www.spglobal.com/marketintelligence/en/news-insights/trending/SLMhFXemp1joe7dmWHnYfA2.

[14]     *Id.*

144.    The transaction was reviewed and challenged as a violation of Section 7 of the Clayton Act by the antitrust regulators at the U.S. Federal Trade Commission. And further evidence that Imidacloprid topicals and Fipronil topicals have a low cross-elasticity of demand and are not in the same relevant antitrust market can be found in the FTC's treatment of the Elanco/Bayer acquisition.

145.    The FTC carefully examined each company's portfolio of animal medications, looking for any "overlaps" of products which might result in Elanco having market power or a monopoly in a particular product after the acquisition was completed. To identify and evaluate "overlaps" which might have anti-competitive effects, the FTC typically uses the Hypothetical Monopolist Test, as described in its Merger Guidelines.

146.    To facilitate this investigation, Bayer and Elanco were both required to make detailed disclosures about the animal medications manufactured by each company, including Bayer's Imidacloprid topicals (the Advantix Products), and Elanco's Fipronil topical, Parastar.

147.    During its review of the Elanco/Bayer acquisition, the FTC identified three overlapping products in which Elanco might obtain market power or monopoly after the acquisition was complete: (1) low-dose prescription treatments for canine otitis externa, (2) fast acting oral treatments that kill adult fleas on canines, and (3) cattle pour-on insecticides.[15]

148.    In other words, the FTC determined that Bayer and Elanco had three different products that overlapped in the same antitrust product market.

---

[15]    Federal Trade Commission, Analysis of Agreement Containing Consent Orders to Aid Public Comment, *In the Matter of Elanco Animal Health, Inc., and Bayer Animal Health GmbH File No. 1910198*, https://www.ftc.gov/system/files/documents/cases/191_0198_elanco_bayer_-_aapc.pdf. a

149.    Significantly, the FTC did not identify an overlap between Bayer's Imidacloprid topicals and Elanco's Fipronil topicals. The FTC's analysis of the products it identified in the same antitrust product market demonstrates why Imidacloprid topicals and Fipronil topicals are not considered in the same antitrust product market.

150.    The FTC narrowly defined the market for canine otitis externa treatments, rejecting "numerous" proposed substitutes, and placing particular emphasis on both the therapeutic action and the method of administration, as follows:

> Numerous prescription products treat canine otitis externa, but only the parties' products—Elanco's Osurnia and Bayer's Claro—require only one or two doses to treat the condition. … other products require numerous applications to the ear canal, up to twice daily for 14 consecutive days, and are thus not reasonable substitutes for the parties' products, which are considerably more convenient to use.[16]

151.    The FTC also narrowly defined the market for fast-acting oral flea and tick treatments, again rejecting "numerous" proposed substitutes and again placing particular emphasis on both the therapeutic action and the method of administration, as follows:

> While there are numerous products that kill and prevent fleas on dogs, most are slower acting or preventative, targeting flea larvae. In contrast, Elanco's Capstar and Bayer's Advantus start killing adult fleas quickly (within 30 minutes for Capstar, and within 60 minutes for Advantus), and eliminate all adult fleas within four hours. Medicated shampoos and sprays that can be used to kill adult fleas are much less convenient to administer and are slower acting.[17]

152.    In each case where an overlap was identified, FTC required Bayer and/or Elanco to divest one or more products, to settle the FTC's antitrust challenge to the transaction.

153.    But because the FTC did not identify an overlap between Bayer's Imidacloprid topicals and Elanco's Fipronil topicals, it did not order divestiture of either of these products. This

---

[16]    *Id.*

[17]    *Id.*

is not surprising, since Imidacloprid topicals have different active ingredients and significantly different therapeutic actions.

   ii.   **Imidacloprid topicals and Fipronil topicals are not therapeutic equivalents.**

154.   The FTC's conclusions are further supported by the non-interchangeability of Imidacloprid and Fipronil.

155.   The active ingredients in flea and tick treatments are insecticides that kill and/or repel fleas and ticks. Some of these insecticides are common agricultural insecticides that are manufactured in enormous quantities and used worldwide. Two common insecticides used for flea and tick protection are Fipronil (which is the active ingredient in the topical treatment Frontline, and generics that compete with Frontline), and Imidacloprid (which is the active ingredient in the Advantage Products, and generics that compete with those products).

156.   Because common agricultural insecticides like Fipronil and Imidacloprid are widely available, inexpensive commodities, they usually constitute a small percentage of the cost of flea and tick treatments. Instead, the major costs for most flea and tick treatments are the delivery systems for these active ingredients (such as a collar or a "squeeze-on" topical solution), together with the very substantial costs of obtaining regulatory approval by the U.S. Environmental Protection Agency for the use of the particular formulation of active ingredients in each flea and tick treatment, as well as the costs of marketing, selling and delivering the products.

157.   Neither wholesale nor retail buyers of Imidacloprid topicals and Fipronil topicals consider them to be interchangeable because they have distinct characteristics.

158.   Imidacloprid topicals and Fipronil topicals are not therapeutic equivalents, because Imidacloprid topicals have therapeutic actions that Fipronil topicals lack. Specifically,

Imidacloprid topicals fully controls flea and tick infestations—in other words, it kills *and* repels fleas. Imidacloprid topicals also repels mosquitos and biting flies.

159.    Imidacloprid topicals preventing those insects that can carry disease from biting the pet. Fipronil topicals cannot repel fleas, ticks or mosquitoes, and those insects must bite the pet, in order to receive a lethal dose of the insecticide.

160.    For example, a "Vet Review" of the K9 Advantix II offered by a Pet Specialty Retailer compares Frontline and K9 Advantix II crystalizes why Imidacloprid topicals are distinct from and non-interchangeable with Fipronil topicals:

> I love the broad acting antiparasitic effects of this product [K9 Advantix II], which covers protection against a wider variety of pests to our pets than the competition. I feel it works the quickest in terms of flea/tick killing, and I love the fact that it repels fleas and ticks as well. Given that we are uncovering new and emerging tick born diseases, I prefer a product that repels in addition to quickly killing ticks, as well, and thus prevents tick attachment and transmission of disease. We are also now recognizing that mosquitoes can transmit diseases like West Nile virus to dogs, and so the added protective benefit of Advantix on mosquitoes and flies makes it quite attractive, especially for those clients whose pets spend a lot of time outside in the yard in the warmer months, when flies are most active. With this product I see much less fly strike and maggot infestation of outside dogs because of this added benefit. By repelling mosquitoes, we also get less transmission of potential heartworms to dogs.[18]

161.    Elanco does not consider Fipronil topicals to be economic substitutes for the Advantix Products. Instead, Elanco deliberately prices its Imidacloprid-based Advantix Products higher than the Fipronil-based Frontline Plus products.

162.    In addition to having distinct formulations, distinct purposes, and distinct pricing, the industry recognizes the two types of products as separate from one another. Nielsen, a global

---

[18] Compare Products, PetMEds,
https://www.1800petmeds.com/comparison?compId=compare90273.

measurement and data analytics company in the industry for pet products, tracks data for Fipronil and Imidacloprid separately.

163.    From a merchant's perspective, Imidacloprid topicals and Fipronil topicals are complements, not substitutes. Merchants who purchase for resale do not substitute one for the other in response to price changes, because consumers expect retailers to carry both products. Consumers generally buy only one flea and tick treatment at a time, but retailers buy a full line of flea and tick treatments. Imidacloprid and Fipronil are not interchangeable to merchants, such as Pet Specialty Retailers, who purchase for resale. To remain competitive and to offer the products that customers expect to find, retailers must carry both formulations.

### iii.    Topical flea and tick medications and delivery systems are also non-interchangeable.

164.    Distinct, non-interchangeable, products deliver flea and tick treatment to pets in different ways, including flea collars, topicals, oral medications, sprays, wipes, and shampoos. A small but significant non-transitory price increase in the price of Imidacloprid topicals did not lead consumers to switch from Imidacloprid topicals to non-topical flea and tick products. These non-topical flea and tick treatments are therefore weak substitutes that are not part of the relevant antitrust market.

165.    In 2018, the fastest growing type of flea and tick product was the flea and tick collar, led by Elanco's (then Bayer's) Seresto flea collar.

166.    The Seresto flea collar is a comparatively expensive product and is currently offered at Pet Specialty Retailers between $59.98 and $67.99. Elanco claims that the Seresto flea collar has a major advantage over other flea and tick treatment products because it provides eight months of protection from a single application.

167.    "Topical" liquid treatments that are applied directly to a pet's skin or fur are distinct from flea collars. In 2018, topicals accounted for the largest dollar amount of flea and tick treatment sales.

168.    Flea and tick treatments may also be given to pets orally. However, oral Imidacloprid products like Elanco's Advantus kill only adult fleas, and do not prevent reinfestation unless given every day.

169.    Additionally, many consumers think of oral treatments as inconvenient and difficult to administer because many pets will not consume the oral treatments or will expel them. In some instances, consumers cannot administer such medications to their pets without using food or pill pouches to conceal the taste and smell of the medication. Even then, pets may reject them. The inconvenience of trying to administer oral products makes them a weak substitute for Imidacloprid topicals.

170.    Other products that contain flea and tick treatments include sprays, wipes, and shampoos. Those products account for a small percentage of total flea and tick treatment sales. Sprays, wipes, and shampoos are not part of the relevant market because they are generally not used for the prevention of fleas and ticks. Sprays, wipes, and shampoos are used for alleviating symptoms in animals that are already infested with fleas and/or ticks. These products can kill fleas and ticks on contact but are generally aimed at relieving infested animals from itching and pain caused by fleas and ticks and washing away dead pests.

171.    The relevant product market in this case does not include flea collars. Flea collars and topical flea and tick treatments are not interchangeable for most consumers. Some consumers prefer the convenience and ease of using a single flea collar for up to 8 months but will not accept the frequency and difficulty of applying a topical treatment to their pet. Other consumers prefer

the lower per-dose price of topicals and the control they have over when to apply them, but dislike the higher initial cost, smell, and appearance of flea collars. In addition, some consumers do not purchase flea collars due to safety concerns.

172.    From the retailer's perspective, topical products are not substitutes for other delivery systems for flea and tick medications like oral treatments, flea collars, shampoos, and baths. Rather, these retailers must carry and sell each of these types of products to remain competitive. For retailers, these different categories of products are complements, not substitutes.

### iv.    Fipronil generics lowered prices of Fipronil flea and tick medications, but not Imidacloprid topicals.

173.    In 1997, Merial (later purchased by Boehringer-Ingelheim) introduced its Frontline topical formulation of Fipronil to the U.S. market. Frontline has remained the single best-selling brand of Fipronil topical since that time.

174.    Beginning in 2011, generic Fipronil topicals, which compete directly with Frontline, entered the U.S. marketplace. By 2018, generic Fipronil topicals accounted for approximately 52% of Fipronil topical sales, with Frontline still accounting for about 48%. The results of generic Fipronil topicals entering the separate market for Fipronil topicals have been more competition against Frontline, lower prices, and more choices for retailers and consumers in that market.

175.    Unlike Fipronil, despite the attempted entry of at least two generic Imidacloprid topical manufacturers, and as of 2021, at least 85% of the relevant market for Imidacloprid topicals is still controlled by Elanco. Elanco has a monopoly in the relevant market and effectively controls nearly 100% of that market, because Bayer receives patent license royalties for most of the remaining 15%. Because of Bayer's anti-competitive conduct, the relevant market has not benefitted from the entry of generics, as the Fipronil market did.

36

176.   In sum, Imidacloprid topicals are in their own relevant antitrust market for several reasons:

- Applying the hypothetical monopolist test shows that Elanco can raise the price of its Advantix Products by a small but significant non-transitory increase in price without decreasing its profits because of a price-induced switch to Fipronil topicals;

- Other flea and tick medications besides Fipronil topicals are even weaker substitutes for Imidacloprid topicals;

- Entry of Fipronil generics into the marketplace lowered the cost of other Fipronil topicals but not Imidacloprid topicals;

- Imidacloprid topicals are therapeutically distinct from other flea and tick medications, including Fipronil, and that conclusion is bolstered by the FTC's own findings and the Pet Specialty Retailers' own understandings and marketing.

### ANTITRUST INJURY

177.   Elanco's anticompetitive agreements and conduct have had the following effects, among others:

a.   Elanco's unlawful conduct forced consumers to pay inflated costs for Imidacloprid topicals;

b.   Elanco's conduct forced consumers to pay inflated costs of the Advantix products because a substantial share of the market has been foreclosed to offering generic Imidacloprid topicals;

c.   Elanco nearly completely foreclosed the generic Imidacloprid topicals from being sold in pet specialty online and instore retailers by its price-fixing scheme and exclusive dealing arrangements;

d.      Elanco inflated its profits by a significant margin by the increased total costs the

Advantix Products sell at due to the price-fixing scheme; and

e.      Elanco's illegal conduct succeeded in substantially foreclosing all meaningful

competition from the relevant market and substantially lessened competition and

tended to create and maintain prices, by keeping generic Imidacloprid topical

manufacturers from selling to a substantial share of the relevant antitrust market.

f.      By reason of the alleged violations of the antitrust laws, Elanco injured Plaintiff

and the classes by forcing them to paying more for Imidacloprid topicals than

they would have paid in the absence of Elanco's anticompetitive conduct, and as a

result Plaintiff and the Classes suffered damages and the Classes are entitled to

equitable relief.

178.    There are no pro-competitive effects of Elanco's conduct that are not substantially

outweighed by the conduct's anticompetitive effects.

179.    Significant economic evidence supports concluding that Elanco's anti-competitive

conduct has resulted in Class members paying for Imidacloprid topicals that have been inflated

to a supra-competitive level.

180.    This is an antitrust injury of the type that the antitrust laws were meant to punish

and prevent.

**CLASS ACTION ALLEGATIONS**

181.    Plaintiff brings this action on behalf of herself and as a class action under Federal

Rule of Civil Procedure 23, seeking damages, equitable, and injunctive relief on behalf of the

following class (the "Nationwide Class"):

**Nationwide Class**: All persons in the United States who, from four years before the filing of this complaint, through the final date of trial, who purchased topical flea and tick products for dogs and cats containing Imidacloprid sold in the U.S., including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store.

182.   In the alternative, Plaintiff brings this action on behalf of herself and as a class action under Federal Rule of Civil Procedure 23, seeking damages pursuant to state antitrust laws, on behalf of the following class (the "State Class"):

**State Class**: All persons in the Indirect Purchase States[19] who, during the applicable limitations period, through the final date of trial, who purchased topical flea and tick products for dogs and cats containing Imidacloprid sold in the U.S., including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store.

183.   Excluded from the Classes are Elanco, its officers, directors and employees; any entity in which Elanco has a controlling interest; and any affiliate, legal representative, heir or assign of Elanco. Also excluded from the Class are any judicial officer(s) presiding over this action and the members of his/her/their immediate family and judicial staff, jurors, and Plaintiff's counsel and employees of their law firms.

184.   Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

185.   Class members are so numerous that individual joinder of all its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiff believes that the Class have many thousands of members, the exact number and their identities being known to Elanco.

186.   Plaintiff will fairly and adequately protect the interests of the members of the Class.

---

[19]   The "Indirect Purchaser States" are the states listed in Count III, below.

Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class.

187.    Common questions of law and fact exist as to all members of the Class and predominate over any question affecting only individual Class members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

      a.    Whether Elanco engaged in the alleged anti-competitive conduct;

      b.    Whether the conduct of Elanco caused injury to the business or property of Plaintiff and the other members of the Class;

      c.    Whether the purpose or effect of Elanco's anti-competitive conduct was to inflate the cost of Imidacloprid topicals and the Advantix Products sold in the U.S.;

      d.    Whether the Per Se or Rule of Reason Standard applies to this case;

      e.    Whether Plaintiff and the other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief;

      f.    Whether Elanco's conduct is unlawful; and

      g.    The appropriate class-wide measures of damages.

188.    Plaintiff's claims are typical of the claims of the members of the Class because their claims arise from the same course of conduct by Elanco and the relief sought within the Class is common to each member.

189.    Plaintiff has retained counsel competent and experienced in the prosecution of antitrust class action litigation to represent herself and the Class. Together, Plaintiff and her counsel intend to prosecute this action vigorously for the benefit of the Class. The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

190.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the Court and Elanco and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the members of the Class to seek redress for the violations of law alleged herein.

191.   Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a.   The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Elanco;

b.   The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or

c.   Elanco has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

**COUNT I**
**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**(Brought on behalf of Plaintiff and the Nationwide Class)**

192.     Plaintiff repeats and incorporate by reference each paragraph above and in Count II of this Complaint.

193.     Beginning more than four years before the filing of this Complaint, and continuing into the present, Elanco engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

194.     The conspiracy alleged herein consists of a continuing agreement among Elanco and the Pet Specialty Retailers to require consumers to pay inflated costs of Imidacloprid topicals, including the Advantix Products, and to foreclose to relevant market from generic competition to the Advantix Products.

195.     In furtherance of the contract, combination, or conspiracy, Elanco has committed the following overt acts:

   a.     Participated in the creation, maintenance, renewal, and implementation of Purchase Agreements that foreclose generic competition to the Advantix Products from the relevant market; and

   b.     Participated in the establishment, maintenance, and implementation of a "no-generics" conspiracy.

196.     Elanco has required consumers to pay an inflated costs for Imidacloprid topicals, including the Advantix Products. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

197.     The contract, combination, or conspiracy created by Elanco caused consumers to

pay inflated costs for Imidacloprid topicals, including the Advantix Product. Plaintiff and the other members of the Class paid these inflated costs during (and before) the last four years in connection with the sale of Imidacloprid topicals. Absent the contract, combination, or conspiracy between Elanco and the Pet Specialty Retailers, Plaintiff and the other Class members would have paid substantially lower costs for the Imidacloprid topicals because generic competitors would have been allowed to enter the market.

198.   Elanco's anticompetitive conduct is a *per se* violation under the federal antitrust laws, specifically 15 U.S.C. § 1.

199.   In the alternative, Elanco's conspiracy is illegal under the federal antitrust laws and violates 15 U.S.C. § 1 under a rule-of-reason analysis.

200.   As a direct and proximate result of Elanco's past and continuing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiff and the other Class members have been injured in their business and property.

201.   Plaintiff and members of the Nationwide Class are entitled to damages to be determined at trial, and an injunction against Elanco, preventing and restraining the violations alleged herein.

**COUNT II**
**Violation of Section 2 of the Sherman Act, 15 U.S.C § 2**
**(Brought on behalf of Plaintiff and the Nationwide Class)**

202.   Plaintiff repeats and incorporate by reference each paragraph above and in Count I of this Complaint.

203.   At all relevant times, Elanco has maintained or attempted to create or maintain its monopoly power in the relevant antitrust market through a course of anticompetitive and exclusionary conduct.

204.     Elanco possesses monopoly power as demonstrated by its share of the Imidacloprid topical market, with effectively nearly 100% of the total Imidacloprid sales.

205.     Elanco willfully acquired and maintained or attempted to create or maintain its monopoly power in the relevant market by unlawful means, including through enforcement of the exclusive dealing arrangements and intentionally foreclosing generic Imidacloprid topicals from the relevant market. These agreements allow the Pet Specialty Retailers to charge supra-competitive prices to consumers on the Advantix Products and allows Elanco to illegally profit over the artificially inflated prices.

206.     As a direct and proximate result of Elanco's past and continuing violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Plaintiff and the other Nationwide Class members have been injured in their business and property.

207.     Plaintiff and members of the Nationwide Class are entitled to damages to be determined at trial, and an injunction against Elanco, preventing and restraining the violations alleged herein.

### COUNT III
### Violation of State Antitrust Statutes
### (Brought on behalf of Plaintiff and the State Class)

208.     Plaintiff asserts Count III in the alternative to Counts I and II. Plaintiff repeats and incorporate by reference paragraphs 1 through 189.

209.     Elanco's anticompetitive conduct constitutes an unreasonable restraint of trade in or has substantially affected commerce in each of the Indirect Purchaser States by: 1) Elanco's coercive conduct to pressure Pet Retail Specialty stores to ban generic Imidacloprid topicals and as a result to inflate the costs of Imidacloprid topicals, including the Advantix Products, and foreclosure of the relevant market from generic competition to the Advantix Products; and

44

2) Elanco's maintenance or attempted to maintenance of its monopoly power in the relevant antitrust market through a course of anticompetitive and exclusionary conduct.

210.    Elanco's anticompetitive conduct has caused unreasonable restraints in the market for imidacloprid topicals in each of the Indirect Purchaser States.

211.    As a result of Elanco's unlawful conduct, Plaintiff and the State Class have been harmed by paying inflated prices for the Advantix Products and by being foreclosed from the generic imidacloprid market.

212.    By engaging in the foregoing conduct, Elanco  intentionally and wrongfully engaged in anticompetitive conduct in restraint of trade, which violates of the following state antitrust laws:

a.   Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to Arizona residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

b.   Cal. Bus. Code §§ 16700, *et seq.*, with respect to California residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

c.   Conn. Gen. Stat. §§ 35-24, *et seq.*, with respect to Connecticut residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

d.   D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to District of Columbia residents

who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

e.  Fla. Stat. §§ 501.201, *et seq.*, with respect to Florida residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

f.  HRS § 480-1, *et seq.*, with respect to Hawaii residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

g.  740 Ill Comp. Stat. Ann. 10/1, *et. seq.*, with respect to Illinois residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

h.  Iowa Code §§ 553, *et seq.*, with respect to Iowa residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

i.  K.S.A. §§ 50-101, *et seq.*, with respect to Kansas residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

j.   10 M.R.S. Ann. §§ 1101, *et seq.*, with respect to Maine residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

k.   Md. Commercial Law Code §§ 11-201, *et seq.*, with respect to Maryland residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

l.   ALM GL ch. 93A §§ 1, *et seq.*, with respect to Massachusetts residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

m.   MCLS Ann. §§ 445.771, *et seq.*, with respect to Michigan residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

n.   Minn. Stat. §§ 325D, *et seq.*, with respect to Minnesota residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

o.   Miss. Code. Ann. §§ 75-21-1, *et seq.*, with respect to Mississippi residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those

products, from a pet specialty store;

p.  Neb. Rev. Stat. Ann. §§ 59-801, *et seq.*, with respect to Nebraska residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

q.  Nev. Rev. Stat. Ann. §§ 598a.010, *et seq.*, with respect to Nevada residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

r.  N.H. Rev. Stat. §§ 358-A, *et seq.*, with respect to New Hampshire residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

s.  N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to New Mexico residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

t.  N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to New York residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

u.  N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to North Carolina residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid,

including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

v.  N.D. Cent. Code §§ 51-08.1, *et seq.*, with respect to North Dakota residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

w.  Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to Oregon residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

x.  R.I. Gen. Laws §§ 6-36-1, *et seq.*, with respect to Rhode Island residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

y.  S.D. Codified Laws Ann. §§ 37-1-3.1, *et seq.*, with respect to South Dakota residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

z.  T.C.A. §§ 47-25-101, *et seq.*, with respect to Tennessee residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

aa. Utah Code Ann. §§76-10-3101, *et seq.*, with respect to Utah residents who

purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

bb. 9 V.S.A. § 2451, *et seq.*, with respect to Vermont residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

cc. W. Va. Code §§ 47-18-1, *et seq.*, with respect to West Virginia residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store;

dd. Wis. Stat. Ann. §§ 133.01, *et seq.*, with respect to Wisconsin residents who purchased topical flea and tick products for dogs and cats containing Imidacloprid, including Elanco's Advantix Products and the equivalent generics of those products, from a pet specialty store.

213.   Plaintiff and members of the State Class seek damages and multiple damages as permitted by law for the injuries they suffered as a result of Elanco's anticompetitive conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, request relief and pray for judgment against Elanco as follows:

a.   An Order certifying the Class under the appropriate provisions of Rule 23 of the Federal Rule of Civil Procedure, and appointing Plaintiff and her counsel to represent the Classes;

b.    Declarations that the actions of Elanco, as set forth above, are unlawful;

c.    Appropriate injunctive and equitable relief on behalf of Plaintiff and the Nationwide Class;

d.    An award to Plaintiff and the other members of the Nationwide and State Classes for damages and/or restitution in an amount to be determined at trial;

e.    An award of pre- and post-judgment interest to Plaintiff;

f.    treble damages as available by state law;

g.    An award to Plaintiff for her costs of suit, including reasonable attorneys' fees and expenses;

h.    An award of such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff, on behalf of herself and all others similarly situated, hereby demand a jury trial of all issues so triable.

Date: July 31, 2024                     Respectfully submitted,

                                        */s/ Scott D. Gilchrist*
                                        Scott D. Gilchrist
                                        Ind. Atty. No. 16720-53
                                        COHEN & MALAD, LLP
                                        One Indiana Square, Suite 1400
                                        Indianapolis, IN 46204
                                        Telephone:      (317) 636-6481
                                        Facsimile:      (317) 636-2593
                                        sgilchrist@cohenandmalad.com

                                             and

                                        **WILLIAMS DIRKS DAMERON LLC**
                                        Eric. L. Dirks
                                        Matthew L Dameron
                                        Clinton J. Mann
                                        1100 Main Street, Suite 2600
                                        Kansas City, Missouri 64105
                                        Telephone:      (816) 945-7100
                                        Facsimile:      (816) 945-7118
                                        dirks@williamsdirks.com
                                        matt@williamsdirks.com
                                        cmann@williamsdirks.com

                                        ***Counsel for Plaintiff and the Proposed Class***